# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | | |
|---|---|---|
| MAIRA OVIEDO-GRANADOS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:21-cv-412 |
| | ) | |
| TOM SPANGLER, in his individual capacity, and | ) | |
| KNOX COUNTY, TENNESSEE, | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

"I will continue to enforce these federal immigration violations with or without the help of [ICE]. If need be, I will stack these violators like cordwood in the Knox County Jail until the appropriate federal agency responds." -*Knox County Sheriff Jimmy Jones upon rejection of his 287(g) application in 2013.*[1]

## INTRODUCTION

Observance of the law separates legitimate law enforcement actions from the indiscriminate vigilante justice inflicted by rogue officials. In 2017, Defendants finally received an offer for an ICE 287(g) agreement deputizing them to enforce federal civil immigration law. Seeking approval from the Knox County Commission, as required to legitimate the agreement under state and local law, would risk having it denied. Instead, Defendants fraudulently represented to ICE having already received the authority to enter into the agreement. Thus, over the past five years, the Defendants have wrongfully received hundreds of thousands of dollars from ICE for illegally detaining thousands of people without probable cause or a criminal warrant. Defendants have

---

[1] News Sentinel Staff, Defiant Knox sheriff to stack illegal immigrant violators 'like cordwood' in jail," *Knoxville News Sentinel*, August 21, 2013, http://archive.knoxnews.com/news/crime-courts/defiant-knox-sheriff-to-stack-illegal-immigrant-violators-like-cordwood-in-jail-ep-510512702-355551431.html/

1

persisted despite repeated stern public warnings from the local legal community and the press that they lacked the authority to enforce civil immigration law.[2]

As Plaintiff's case demonstrates, intentional civil rights violations mar every aspect of Defendants' civil immigration detention practices; even with a 287(g) agreement, Defendants have committed and continue to commit systematic and deliberate civil rights violations in breach of federal and state law, ICE policy, and the federal Constitution.

## COMPLAINT

1. Maira Oviedo-Granados ("Plaintiff") brings this action for declaratory relief, injunctive relief, compensatory damages, and punitive damages under various theories including but not limited to claims under 42 U.S.C. § 1983 and state law against Defendants Tom Spangler, in his individual capacity ("Spangler"); and against Knox County, Tennessee, based on the actions of Mayor Glenn Jacobs ("Jacobs") and Sheriff Spangler in their official capacities, on behalf of herself and prospective class members.

2. This case arises out of Ms. Oviedo's unlawful and racially discriminatory seizure, arrest, interrogation, detention, and recommendation for prosecution by Defendants pursuant to their unlawful and unconstitutional municipal policies, practices, and customs.

3. Defendants have made it their policy to illegally detain Hispanic and foreign-born persons. Ms. Oviedo is but one of over a thousand people Defendants have illegally detained for profit in the past five (5) years.

---

[2] *See* Exhibit 11; *see also* Exhibit 9 (Defendant's April 16, 2021 letter memorandum arguing against need for county commission approval).

4. Because the defendants are a local sheriff and a county, they need a valid 287(g) agreement with ICE in order to enforce federal civil immigration law. Defendants tricked ICE into issuing them a 287(g) agreement but never satisfied the state and local requirements allowing them to enter into the agreement, such as receiving the approval of the democratically elected county commission. Defendants are fully aware that they have never had a valid 287(g) agreement yet persist in subjecting foreign-born persons to illegal detentions in order to siphon money from taxpayer coffers. Over the course of five years, Defendants have made hundreds of thousands of dollars for illegally detaining thousands of people. Every single one of these detentions violates the Fourth Amendment and state law.

5. As an extension of this campaign against foreign born persons, particularly Spanish-speaking immigrants, Defendants routinely arrest immigrants without probable cause and then illegally detain them for money. Ms. Oviedo, the Plaintiff, legally works and resides in Knox County. She called the police for protection from her domestic abuser during a violent attack and was subsequently arrested by KCSO deputies. A judge ordered her release, but Defendants continued her detention in violation and denied her access to her attorney, violating the Supremacy Clause and her clearly established rights. She was then spirited away from Knox County and imprisoned for profit while separated from her children from November 7, 2020, through early January 2021, thereby suffering pecuniary damages and severe and ongoing trauma and emotional distress.

6. The deprivations and civil rights violations inflicted on Ms. Ovideo are typical of those inflicted on the more than a thousand people by Defendants detained under their illicit immigration enforcement program.

3

## PARTIES

7. Plaintiff is resident of Knox County, Tennessee, who pays state and local taxes. She has a government-issued Social Security number and work permit in connection with her pending immigration proceeding seeking asylum based on domestic abuse and gender-based violence. Before her detention, she owned and operated a legally licensed cleaning business.

8. Sheriff Tom Spangler is the duly elected Sheriff of Knox County, elected in 2018.

9. Knox County Sheriff Tom Spangler is only sued in his individual capacity for malicious harassment under the Tennessee Human Rights Act.

10. Sheriff Spangler and the Mayor of Knox County, Glenn Jacobs, have both publicly rebuffed the power of federal law to bind local officials, sending signed and sealed letters to the President of the United States refusing to comply with executive orders they deem unconstitutional.

11. Knox County is a municipal entity in the state of Tennessee, organized under the Knox County Charter.

12. Sheriff Spangler sets law enforcement policy and practices for Knox County and the Knox County Sheriff's Office.

13. In the alternative, Knox County sets law enforcement policies and practices for Knox County and the Knox County Sheriff's Office.

14. Any person wronged by the act of a Sheriff's deputy may bring suit against the county. *See* Tenn. Code Ann. § 8-8-302.

15. At all relevant times Defendants have acted under color of state law.

4

## JURISDICTION AND VENUE

16. This action was originally filed by Plaintiff in Knox County Circuit Court on November 8, 2021, pursuant to § 16-10-101 (jurisdiction) and § 20-4-101 (venue).

17. Citing 28 U.S.C.§ 1441(b) and 28 U.S.C. § 1331, Defendants removed this action to the United States District Court for the Eastern District of Tennessee, at Knoxville, on December 8, 2021.

18. This Court also has supplemental jurisdiction over all state claims under 28 U.S.C. § 1367 because all claims here are so related to as to form part of the same case and controversy and also arise from the same set of operative facts.

## FACTUAL ALLEGATIONS

**A. Defendants arrested Plaintiff after she called 911 to protect herself and her three children from a domestic assault by her armed domestic partner.**

19. In 2014, Plaintiff came to the United States seeking asylum from gender-based violence in her native Honduras.

20. Plaintiff has a pending asylum claim.

21. Plaintiff has a Social Security card and legal permission to work in the United States.

22. Until the Fall of 2020, Plaintiff lived with her three children in Knox County.

23. Plaintiff also lived with her then-partner who is an English-speaking American citizen, and the father of her youngest child.

24. Plaintiff and her partner had bought their house jointly, but it was titled only in his name.

25. Plaintiff's domestic partner abused Plaintiff physically, emotionally, and sexually.

26. On or about October 31, 2020, Plaintiff's partner forcibly removed her clothing and raped her, leaving heavy bruises on her thighs.

5

27. Early in the morning on November 7, 2020, Plaintiff's partner went to the house of Plaintiff's male friend. Suspecting that the Plaintiff was having an affair, he assaulted the friend, threatening to shoot him and inflicting serious injuries.

28. Despite the brutality of the assault and the severe injuries inflicted, no one called the police because Plaintiff's partner is an American citizen, and the other victim knew that encounters with KCSO or Knoxville law enforcement would lead to arrest and civil immigration detention.

29. The Plaintiff was at home with her three children during this time.

30. Plaintiff male friend's family member called the Plaintiff, describing the attack and warning her that Plaintiff's domestic abuser was coming back home.

31. Once home, Plaintiff's partner, now suspected to be armed and threatening Plaintiff, assaulted her. She broke free of his grasp and shut herself in her bedroom with her children to call 911.

32. The 911 operator and translator knew that the domestic partner was abusive to Plaintiff, was armed, had just committed a violent assault against another man, had assaulted Plaintiff, and could hear him yelling in the background.

33. The 911 operator assured Plaintiff that KCSO deputies would soon be there to help her.

34. Around 2:30 AM, KCSO deputies arrived at the Plaintiff's house.

35. The deputies saw the bruises on the Defendant's thighs from the October 31 sexual assault, noting in their arrest report that the partner had inflicted the bruises.

36. No deputies spoke Spanish.

6

37. Although the operator and translator were both waiting on an open line to facilitate communication between the Plaintiff and the deputies, the deputies did not use the translator.

38. The arrest report claims that the Plaintiff and her partner gave conflicting accounts of their physical struggle that evening. The Plaintiff claimed that her partner had been the aggressor, throwing her down onto their couch The partner claimed that Plaintiff had been cheating on him and he had gotten into a fight with Plaintiff's boyfriend. Despite admitting to having been in a fight with another man that same evening, the partner claimed that the Plaintiff had struck him and inflicted marks on the left side of his face.

*The missing body camera footage*

39. The arrest report fails to note that at least three deputies were involved in the arrest, not just Wesley Kitts.

40. The arrest report claims that there was no body camera footage.

41. Body camera footage exists of the arrest.

42. One unidentified officer took an approximately two-minute-long video of him arresting Plaintiff and putting her in a KCSO van. The footage was taken at approximately 4:30 AM, over two hours after the encounter began.

43. KCSO's General Order Number 10-001 requires that "[o]fficers shall not tamper with or erase any video captured by their officer worn body camera." Officer body cameras "will be activated" when an officer is dispatched or has "potential for citizen contact." "Failure to activate the video/audio recording equipment as outlined in the General Order or the abuse, misuse of the video/audio recording equipment will result in disciplinary actions."

7

If a body camera malfunctions, an officer must immediately notify their supervisor as to why a recording was not made.

44. None of the other deputies present took body camera footage, yet their disciplinary files (in possession of Defendants) contain no evidence of Order 10-001's mandatory disciplinary action.

45. Plaintiff stands four feet, ten inches tall.

46. Consistent with Defendants' policy of subjecting non-English speakers of color to disparate treatment, KCSO deputies arrested the Plaintiff for simple assault on her English-speaking partner.

47. Plaintiff's records pertaining to Plaintiff's November 7, 2020 arrest and criminal detention were obtained on October 21, 2021 by a section 10-7-503 Tennessee Public Records Act request to Defendant Sheriff Spangler. *See* Exhibit 2: KCS Detention Records.

48. Sheriff Spangler's record custodian represented these records as containing all responsive records in possession of Defendant Sheriff Spangler.

49. Tenn. Code Ann. § 36-3-619 sets out the factors to be considered by a police officer when confronted with two persons accusing each other of domestic assault, including severity of injuries, whether one party acted in self-defense, and a history of domestic abuse.

50. Despite being a part of the domestic violence unit, the responding KCSO deputies have not received proper training in handling domestic assault situations or dealing with non-English speaking civilians.

51. The personnel files of the responding KCSO deputies show certificates for training in firearms and forensic but there is no indication that they have been trained in handling domestic assault situations or dealing with non-English speaking civilians.

52. There is an obvious need to train KCSO deputies in how to address mutual domestic violence allegations and how to communicate with Spanish-speaking only persons.

53. The failure to thus properly train the responding deputies here caused Plaintiff to be wrongfully arrested, detained, and prosecuted for domestic assault.

54. At all times, the arresting deputies acted intentionally and by virtue of and under color of state law and the Sheriff's office.

55. Probable cause did not exist for Plaintiff's arrest.

**B. Without probable cause of a crime's commission or even an ICE immigration warrant, Defendants independently decided to detain Plaintiff even after a judge ordered her release.**

56. After her arrest, KCSO deputies transported Plaintiff to the Roger D. Wilson Detention Facility at 5001 Maloneyville Road, Knoxville, TN 37918.

57. Had KCSO deputies arrested Plaintiff for simple assault, as noted on her arrest report, she would have been quickly released from detention under Knox County's COVID-19 detention policy.

58. Plaintiff requested to speak with her attorney Rachel Bonano.

59. Tennessee Code Annotated section 40-7-106 requires that persons be allowed to call their attorney before being booked into detention.

60. Defendants refused to let Plaintiff speak with her attorney.

61. Instead, KCSO deputies charged Plaintiff with domestic assault, thus triggering a mandatory twelve-hour hold.

9

62. A Knox County General Sessions magistrate ordered that Defendants release Plaintiff from detention after a twelve-hour hold ending at 2:08 PM on November 7, 2020.

63. In violation of the Court's order, Defendants did not release Plaintiff at 2:08 PM on November 7, 2020.

64. Instead, on Defendants' behalf and in accordance with their custom, policy, or practice, during the twelve-hour hold, KCSO Deputy Tina Cloninger ("Cloninger") signed an ICE I-247A detainer stating that there was probable cause to believe the Plaintiff was a removable alien based on evidence gathered from Plaintiff's interrogation and biometric data scan. Exhibit 2, p. 16.

65. Cloninger is not an ICE agent.

66. Cloninger is not an ICE designated immigration officer because she is not an ICE employee and the Defendants do not have a valid 287(g) agreement or ICE IGSA.

67. Cloninger signed the ICE I-247A claiming to be an ICE designated immigration officer and claiming to have sent the ICE I-247A from the Knoxville ICE office on Prosperity Road.

68. Cloninger is a KCSO officer and was then at the Roger D. Wilson Detention Facility.

69. Cloninger had not interrogated Plaintiff or conducted a biometric scan.

70. As is Defendant's custom, policy or practice, Cloninger failed to conduct any investigation as required under 8 U.S.C. 1229(e)(2)(A) to determine whether Plaintiff's appearance before the Magistrate Judge was in connection with abuse by a U.S. citizen or permanent resident.

71. Plaintiff had only been asked for her name, date of birth, and country of birth.

72. On information and belief, it is Defendants' custom, policy, or practice to issue I-247A immigration detainers based solely on knowledge or belief that a person in KCSO custody had been born outside of the United States.

73. On information and belief, Cloninger issued an I-247A based solely on her knowledge that Plaintiff had been born outside of the United States.

74. Acting on the Defendants' behalf, Cloninger initialed an I-286 form stating that ICE had decided to take Plaintiff into custody and acknowledged that she had read the form to the Plaintiff.

75. The I-286 was timestamped 1:25 PM on November 7, 2020. *See* Exhibit 3: I-286.

76. No ICE employee was present at the KCSO detention center at that time.

77. On information and belief, Cloninger does not speak or read Spanish.

78. On the I-286, Cloninger indicated that Plaintiff had acknowledged receipt of the form, had not requested for an immigration judge to review the I-286 custody determination, and had refused to sign the I-286.

79. Cloninger never read the I-286 form to Plaintiff.

80. The I-286 was never presented to Plaintiff.

81. Plaintiff would have requested review of the custody determination by an immigration judge had she been read the I-286 form.

82. Plaintiff did not refuse to sign the I-286.

83. It is Defendants' custom, policy, or practice to detain suspected undocumented immigrants without having a valid ICE administrative warrant.

84. It is Defendants' custom, policy, or practice to detain suspected undocumented immigrants without presenting them with an I-286 or allowing them to ask for an immigration judge to review their status determination.

85. Neither the Defendants nor ICE issued an administrative warrant authorizing Plaintiff's detention.

86. Neither Plaintiff nor her Attorneys have been given a copy of any administrative warrant or an I-213 recording the contents of the supposed immigration interview conducted by Cloninger.

87. Defendants do not possess an I-213 interview form or an administrative warrant for Plaintiff.

88. Acting on the Defendants' behalf, Cloninger signed an ICE I-216 form that claimed to transfer Plaintiff from KCSO custody at the KCSO detention center and into ICE custody at the KCSO detention center. Exhibit 2, p. 6.

89. At all times, Cloninger acted intentionally and by virtue of and under color of state law and the Sheriff's office.

90. Because ICE pays Defendants $83.00 per day for each immigration detainee, this transfer allowed KCSO to illegally profit from Plaintiff's detention.

91. The Defendants continued to detain Plaintiff until November 9, 2021, when she was physically transferred out of the KCSO detention center and into ICE's custody at a different facility.

92. By physically transferring Plaintiff into ICE custody, Plaintiff was prevented from attending her arraignment for domestic assault on November 10, 2021.

12

93. ICE detained Plaintiff for more than two months in a for-profit Louisiana detention center, away from her children and employment. Plaintiff was released only after payment of a substantial bail of $5000, paid through a bail bond company at a high rate of interest.

94. When Plaintiff returned to Knox County, she was barred from returning to her house by the terms of her release from Knox County Detention.

95. After the prosecuting assistant district attorney learned the facts underlying Plaintiff's arrest and read the 911 telephone transcript, all charges against Plaintiff were dropped on May 26, 2021.

96. Plaintiff suffered from and continues to suffer from emotional distress and mental anguish, including anxiety and depression, inflicted by her unlawful arrest for domestic assault and her subsequent arrest and detention for civil immigration violations, requiring her to seek mental health treatment.

97. On information and belief, Plaintiff would not have been detained by ICE but for her wrongful arrest for simple assault and prosecution for domestic assault.

**C. Clearly established law requires a valid 287(g) agreement in order for Defendants to enforce federal civil immigration law, and a valid ICE IGSA to hold suspected undocumented immigrants in exchange for ICE payments.**

98. It is not a crime for a removable alien to be present in the United States. Accordingly, removal proceedings are a civil matter, not criminal.

99. The Immigration and Nationality, 8 U.S.C. § 1101 *et seq*. ("INA"), establishes a comprehensive federal scheme defining the conditions under which immigrants to the United States may be removed from the country.

100. ICE is a sub-agency of the U.S. Department of Homeland Security.

13

101. Among other responsibilities, ICE has the authority to perform pre-custody law enforcement functions prior to taking custody of an individual as set forth in INA section 287(a), such as interrogating and investigating suspected undocumented immigrants. ICE also has the authority to perform certain post-custody functions, including detaining immigrants for civil immigration violations that subject them to removal and holding individuals during the "removal period" from the date of a removal order to the date of actual deportation. These detainees are not charged with a crime but are civil "administrative detainees" of ICE.

102. ICE detains hundreds of thousands of people each year, holding many for prolonged periods of time.

103. By default, state and county local law enforcement agencies ("LEAs") and entities like the Defendants lack the legal authority to independently enforce federal immigration law. *See Lopez-Aguilar v. Marion Cty. Sheriff's Dep't*, 296 F. Supp. 3d 959, 977 (S.D. Ind. 2017) ("Only when acting under color of federal authority, that is, as directed, supervised, trained, certified, and authorized by the federal government, may state officers effect constitutionally reasonable seizures for civil immigration violations."); 8 CFR § 287.8(b) (restricting ability to conduct immigration interrogation to immigration officers only); 8 CFR § 287.8(c) (restricting ability to arrest an immigration suspect to immigration officers only).

104. Under INA section 287(g), codified at 8 U.S.C. § 1357(g)(1), if consistent with state and local law, ICE can enter into in a written 287(g) agreement with state, local, or private entities that authorizes state or local law enforcement to perform select immigration

14

enforcement functions specified in the written agreement, including detaining suspected immigration violators.

105. A valid 287(g) agreement is the only legal avenue permitting an LEA to independently enforce federal immigration law.

106. Although the scope of any given agreement can vary, a valid 287(g) agreement can permit properly trained LEA officers to act as a federal immigration officers by detaining and interrogating suspected undocumented immigrants, investigating suspected immigration violations, and performing the administrative tasks required for a constitutionally-sufficient immigration detention. *Renteria-Villegas v. Metro. Gov't of Nashville & Davidson Cty.*, 382 S.W. 3d 318, 321 (Tenn. 2012); *see Abriq v. Hall*, 295 F. Supp. 3d 874, 880 (M.D. Tenn. 2018) (quoting 8 U.S.C. § 1357(g)(1)).

107. 8 U.S.C. § 1357(g)(1) is voluntary and does not and cannot require or authorize local law enforcement to enter into a 287(g) agreement contrary to state or local law.

108. ICE enters into written contracts known as IGSAs with states, localities, or private facilities to house administrative detainees in exchange for payment.

109. Defendants do not have (and have never had) a valid 287(g) agreement or valid ICE IGSA and therefore cannot legally enforce federal immigration laws or profit from detaining suspected undocumented immigrants.

110. Even if Defendants' 287(g) agreement were valid, page six of that agreement requires that Defendants follow ICE policies when attempting to perform ICE duties.

111. Defendants failed to follow ICE policies in detaining Plaintiff and other suspected immigration violators.

112. All ICE 247-A detainers require an I-200 ICE immigration warrant or I-205 warrant of removal signed by an authorized ICE immigration officer. ICE Policy 10074-2.

113. It is Defendants' custom, policy, and/or practice to routinely ignore and disregard ICE policies when detaining suspected undocumented immigrants; in the alternative, Defendants have failed to train their employees in following ICE policies and are deliberately indifferent to their employees' failures to follow ICE policies.

114. It is Defendants' custom, policy, or practice to seize Hispanic and foreign born persons on criminal charges and then, when those persons are set to be released for the original criminal charge, subject them to a second warrantless seizure based on suspected civil immigration violations.

**D. _Monell Allegations_ – Defendant Knox County's Official Policy, Practice, and Custom of Violating the U.S. Constitution.**

**(i)     Federal law, Tennessee state law, and the Knox County Charter require Knox County Commission approval of any 287(g) agreement or ICE IGSA.**

115. 8 U.S.C. § 1357(g)(1) specifies that law enforcement agencies must act in a manner that is "consistent with State and local law" with respect to 287(g) agreements.

116. Under Tennessee Code Annotated section 12-9-104, a political subdivision of the State can only enter into a contract if its "governing bod[y]" takes appropriate action "by resolution or otherwise pursuant to law."

117. Tennessee Code Annotated section 50-1-101 requires that a county's legislative body approve a 287(g) agreement:

> For purposes of enforcing immigration laws, … the legislative body of a municipality or county, or the chief law enforcement officer of the county upon approval by the governing legislative body, may enter into a written agreement, in accordance with federal law, between the municipality or county and the United States

16

Department of Homeland Security concerning the enforcement of federal immigration laws, detention and removals, and investigations in the municipality or county.

118. In *Renteria-Villegas v. Metro. Gov't of Nashville & Davidson Cty.* —the only Tennessee decision containing the phrase "287(g)"—the Tennessee Supreme Court cited compliance with section 50-1-101 as a prerequisite for entering into a valid 287(g) agreement. 382 S.W.3d 318, 322 n.4 (Tenn. 2012)

119. Under section 3.03(M) of the Knox County Charter the County Mayor has "the sole power and authority to enter into contracts on behalf of Knox County, except as otherwise provided in this Charter. Contracts and purchases on behalf of the County shall be entered into by the Mayor or the Mayor's designee."

120. Under Knox County Charter section 2-649, "[a]ny order, agreement, or obligation that is contrary to these policies and procedures is void, and no person shall have any claim or demand whatsoever against the county."

121. The Knox County Mayor's contracting authority is not unlimited and requires Knox County Commission approval before entering into certain contracts.

122. Under Knox County Charter section 3.03(M), for "all contracts in an amount greater than $50,000, or such greater amount as established in advance by the Commission, the Mayor shall obtain the approval of the Commission by resolution prior to execution." *Id.*

123. Similarly, under Knox County Charter section 3.03(E), when a contract is "with various municipalities, other governmental units or public corporations," such as a federal agency, the Mayor must receive "the authorization of the Commission by resolution."

17

124. Section 2-581 requires county commission approval for all contracts or agreements entailing "[t]he acceptance of grants from the United States of America or the state and as required by Tenn. Code Ann. § 5-8-101," as well as "[p]roposed contracts involving projects or programs not previously approved by the commission."

### (ii) Defendants unlawfully procured the 287(g) agreement by misrepresenting to ICE their legal authority to contract.

125. In August of 2013, ICE denied then Knox County Sheriff Jimmy Jones' application to enter KCSO into a 287(g) agreement. In response, Sheriff Jones vowed that "I will continue to enforce these federal immigration violations with or without the help of Immigrations and Customs Enforcement. If need be, I will stack these violators like cordwood in the Knox County Jail until the appropriate federal agency responds."[3]

126. On February 21, 2017, Sheriff Jones again applied to ICE for a 287(g) agreement. Page five of his application incorrectly claims that the Sheriff is the Political Entity supervising the Knox County Sheriff's Office and that the Political Entity had concurred with the request for ICE support. *See* Exhibit 4, Knox County Sheriff's Needs Assessment.

127. The Knox County Sheriff is not the political entity capable of entering KCSO or Knox County into a 287(g) agreement.

128. On June 13, 2017, Sheriff Jones signed an ICE 287(g) agreement ("2017 287(g) agreement"). *See* Exhibit 5, 2017 287(g) Agreement.

---

[3] News Sentinel Staff, Defiant Knox sheriff to stack illegal immigrant violators 'like cordwood' in jail," *Knoxville News Sentinel*, August 21, 2013, http://archive.knoxnews.com/news/crime-courts/defiant-knox-sheriff-to-stack-illegal-immigrant-violators-like-cordwood-in-jail-ep-510512702-355551431.html/

129. On information and belief, an unknown number of KCSO deputies underwent ICE training in immigration enforcement, and began investigating, interrogating, and detaining suspected undocumented immigrants.

130. Sheriff Spangler has signed two (2) renewed 287(g) agreements: the first was signed on May 14, 2019, and the second was signed on May 8, 2020.

131. All three 287(g) agreements required the sheriffs to verify that they possessed the legal authority to enter in the agreement: "By signing this MOA, each party represents it is fully authorized to enter into this MOA, accepts the terms, responsibilities, obligations, and limitations of this MOA, and agrees to be bound thereto to the fullest extent of the law." Pages 1 and 11 of the 2017/2019 MOA and page 7 of the 2020 MOA.

132. Both sheriffs signed the agreements despite lacking legal authorization to enter into the 287(g) agreements.

133. The 2020 287(g) renewal extended the 287(g) agreement indefinitely until cancelled by KCSO or ICE.

134. None of these 287(g) agreements have received approval by resolution from the Knox County Commission as required by law.

135. None of these 287(g) agreements were signed with the approval of the Knox County Mayor as required by law.

136. Defendant's 287(g) agreements only allow for a limited number of KCSO deputies to be trained to enforce federal immigration law.

137. Defendant's 287(g) agreements do not permit trained KCSO deputies to execute immigration arrests or interrogations outside of the Knox County Detention Center.

**(iii)  Defendants have signed at least four unauthorized IGSAs with ICE without Knox County Commission approval.**

19

138. In 2013, Sheriff Jones signed a US Marshals Service IGSA, Contract No. 74-13-0015 ("2013 IGSA"), agreeing to house prisoners of the United States Marshals Service in KCSO's detention facilities in exchange for a daily fee. ICE is listed as an authorized party capable of also using the agreement to house detainees. *See* Exhibit 6, Knox County IGSAs.

139. In June 2018, Sheriff Jones signed a two-page IGSA directly with ICE ("June 2018 IGSA"). The offeror listed on the IGSA is Knox County. This IGSA was listed as part of Contract No. 74-13-0015. *See* Exhibit 6, Knox County IGSAs.

140. All ICE IGSAs appear to be part of the same contract, Contract No. 74-13-0015.

141. On November 19, 2018, Mayor Glenn Jacobs signed a two-page IGSA with ICE ("November 2018 IGSA"). The offeror listed on the IGSA is Knox County. *See* Exhibit 6, Knox County IGSAs.

142. On October 1, 2019, Mayor Glenn Jacobs signed a thirteen-page IGSA with the United States Marshal's Service; this IGSA was nearly identical in form and content to the 2013 IGSA and includes ICE as an "Other Authorized User Agency." ("2019 IGSA"). The 2019 IGSA is stamped as having been approved by the Knox County Law Director's Office. *See* Exhibit 6, Knox County IGSAs.

143. None of these ICE IGSAs received approval by resolution from the Knox County Commission as required by state and local law.

144. The ICE IGSAs signed by Sheriff Jones were not signed with the permission and approval of the Knox County Mayor as required by state and local law.

**(iv)** **Since at least August 2018, Defendants have unlawfully enforced federal immigration law and falsely imprisoned thousands of suspected noncitizens without the legal authority of a valid 287(g) agreement or ICE IGSA.**

20

145. Since the implementation of the Defendants' illegal 287(g) program, it is Defendants' practice to detain suspected undocumented immigrants for pretextual reasons, such as arresting victims of domestic violence committed by a United States citizen or minor non-violent criminal charges such as driving without a license, charges for which defendants would not have previously been detained.

146. After being taken into custody, KCSO deputies—the Defendants' agents—investigate and interrogate suspected undocumented immigrants about their immigration status. The Defendants continue to detain these suspected undocumented immigrants as administrative detainees of ICE even after resolution of the original criminal charges initiating the detention.

147. These civilly detained persons are later physically transported by ICE to an ICE detention facility.

148. Since at least August of 2018, the Defendants' policy and practice has been to have KCSO deputies illegally act as federal immigration officers by investigating, interrogating, and detaining suspected undocumented immigrants and jailing administrative detainees in KCSO's detention facilities. KCSO has housed administrative detainees in its detention facilities in exchange for a daily fee paid by ICE.

149. Under the pretense of having a valid 287(g) agreement, Defendants have interrogated and detained thousands of suspected undocumented immigrants. *See* Exhibit 7, *KCSO-ICE Detention Statistics 2017-2021* (attached).

150. In addition, Defendants engaged in an unlawful policy, practice, and custom of issuing their own ICE I-247A detainers for any criminal detainee who reports having been born outside of the United States.

151. Defendants engaged in an unlawful policy, practice, and custom of detaining suspected undocumented immigrants without valid I-286 custody determinations or ICE administrative warrants.

152. Subjecting persons to warrantless arrests for civil immigration violations, as Defendants did to Plaintiff, violates the Fourth Amendment.

153. Defendants' practice of seizing persons without a warrant for suspected civil immigration offenses also violates Tennessee Code Annotated section 40-7-106, that an arresting officer must present a warrant to the arrestee at the time of arrest, and Tennessee Code Annotated section 40-7-103, which does not allow suspicion of a civil immigration violation as grounds for a warrantless detention.

154. In the alternative, Defendants routinely engage in the policy, custom or practice of detaining persons based only on civil immigration warrants alleging civil immigration violations.

155. Civil immigration warrants are not issued based on a neutral and detached magistrate's finding of probable cause of a crime's commission but only on an ICE officer's belief that a person may have committed a civil immigration infraction.

156. By failing to thus satisfy the Fourth Amendment, any civil immigration detention pursuant to an administrative warrant violates the detainee's Fourth Amendment right to be free from warrantless arrest.

157. Defendants engaged in an unlawful policy, practice, and custom of civilly detaining suspected undocumented immigrants without conducting an immigration interview, biometric scan, or other probable cause determination.

158. These illegal investigations, interrogations, and detentions form part of an ongoing custom, policy, and practice of Defendants to take custody of suspected undocumented immigrants illegally for ICE in return for payments.

159. It is the policy and custom of the Defendants that KCSO deputies routinely act as immigration officers by enforcing federal immigration law, including by interrogating and detaining suspected undocumented immigrants and by signing ICE I-247A, I-286, and I-216 forms, falsely representing on these forms that KCSO deputies are legitimate immigration officers.

160. The Defendants' illegal 287(g) program has required expending public taxpayer funds on the detention of those individuals and expenses for food, medical care, and staffing and administration costs.

**(iv)  ICE has paid Defendants at least $165,570.00 under the IGSAs in exchange for illicit detention of suspected undocumented immigrants since at least 2018.**

161. In total, between June of 2018 until July of 2020, Defendants have billed detention invoices to ICE for approximately $143,549.00. ICE has paid Defendants at least $165,570.00 over that same period. *See* Exhibit 8, ICE payment orders ($94,952.00 on May 15, 2020; $60,568.00 on June 11, 2019; $10,050.00 on June 28, 2018).

162. The Defendants continue to bill ICE for every day they detain a suspected undocumented immigrant.

163. Despite exceeding the $50,000.00 limits set by Knox Count Charter section 3.03(M) and meeting the requirements for sections 3.03(E) and 2-581, the 287(g) agreement and ICE IGSAs have not received the required approval from the Knox County Commission.

**(v).  Defendants are estopped from claiming the existence of a valid ICE IGSA.**

164. In the recent Knox County Chancery Court case *Meghan Conley v. Knox County Sheriff Tom Spangler*, Sheriff Spangler repeatedly denied having a valid IGSA with ICE. "It is denied that KCSO has entered into various intergovernmental service agreements ("IGSA") with ICE and strict proof thereof is demanded" Respondent's Answer ¶¶ 6, 28-38, Knox County Chancery Court No. 197897-1, October 2, 2019. *See E. Natural Gas Corp. v. Aluminum Co. of Am.*, 126 F.3d 996, 1002 (7th Cir. 1997) ("[P]rior pleadings . . . are admissible in a civil action as evidentiary admissions.").

165. Defendants, through Sheriff Spangler, admitted in the same pleading that it does not have a valid IGSA with ICE: "Respondent would show that all requests for IGSAs referenced IGSA between Knox County and ICE. There are no such documents." *Id.*

166. The above documents are public records in the possession of the Defendants.

167. Defendants are judicially estopped from claiming to now have a valid ICE IGSA.

> **(v)   Defendants failed to inform the Tennessee governor, lieutenant governor, and speaker of the house of representatives of their 287(g) agreement, as required by Tennessee law.**

168. Effective beginning in 2020, Tennessee Code Annotated section 7-68-105(c) requires that "[w]henever a law enforcement agency enters into" or renews "a memorandum of agreement [concerning the enforcement of federal immigration laws], notice of the agreement must be submitted in writing to the governor, . . . the lieutenant governor, and the office of the speaker of the house of representatives."

169. In an April 16, 2021 memorandum to the Knox County Commission, the Knox County Law Director claimed that County Commission approval was not required for the 287(g) program because the Defendants had provided section 7-68-105(c) notice to state official on an unspecified date. Exhibit 9.

24

170. By April 16, 2021, Defendants had not in fact provided notice as required by section 7-68-105(c).

171. Defendants only provided section 7-68-105(c) notice to the governor, lieutenant governor, and speaker of the house of representatives by letter dated April 21, 2021. Exhibit 10: Knox County Law Director 287(g) Memorandum.

**(vi)** **Defendants know that the 287(g) agreement and ICE IGSAs require and have never received approval by resolution from the Knox County Commission.**

172. 287(g) programs were discussed at Knox County Commission meetings on June 25, 2012, July 23, 2012. August 26, 2013, June 26, 2017, July 22, 2019, and April 19, 2021.

173. At none of these meetings did the Knox County Commission approve a 287(g) agreement or IGSA between Knox County and ICE.

174. Without the approval of the Knox County Commission, any 287(g) agreements or IGSAs signed by the Knox County Sheriff or Knox County Mayor are void under Tennessee law and the Knox County Charter.

175. Without a valid ICE IGSA, Defendants cannot independently conduct federal immigration enforcement for profit.

176. Since the beginning of the Knox County 287(g) program, Defendants have known that state and local law required that the 287(g) agreement receive Knox County Commission approval before Defendants could begin immigration enforcement.

177. Since the beginning of the Knox County 287(g) program, Defendants have had actual knowledge that the Knox County Commission has never approved the IGSAs or 287(g) agreement.

25

178. Defendants know that Knox County Commission approval is required for the 287(g) agreement and ICE IGSAs. Defendants regularly present for Knox County Commission approval federal contracts under which Knox County receives payments from the federal government as compensation for services performed by the Defendants.[4]

179. Defendants have publicly denied that the 287(g) agreement and IGSAs require Knox County Commission approval, claiming that none of the agreements concerned enforcement of federal immigration law.[5]

180. Defendants' unlawful detention of suspected undocumented immigrants inflicts serious and continuing violations of those detainees' civil rights.

181. Defendants knowingly hold ICE administrative detainees even after the criminal charges responsible for their initial detention have been resolved.

182. By holding administrative detainees without criminal probable cause, Defendants routinely and purposefully violate those detainees' Fourth Amendment rights against unlawful seizure, arrest, and detention, their Fifth and Fourteenth Amendment rights to due process of law and equal protection, and their Tenth Amendment rights to be free from unlawful state enforcement of federal laws reserved by the Supremacy Clause to the federal government.

---

[4] See, e.g., Knox Cty. Com. R-20-2-303, Reg. Sess. (Tn. Feb. 24, 2020) (IN RE: CONSIDERATION OF A RESOLUTION OF THE COMMISSION OF KNOX COUNTY, TENNESSEE APPROVING A MEMORANDUM OF UNDERSTANDING AND OBLIGATION DOCUMENT WITH THE UNITED STATES MARSHALS SERVICE FOR THE REIMBURSEMENT OF OVERTIME EXPENSES INCURRED BY THE KNOX COUNTY SHERIFF'S OFFICE IN ASSISTING THE VIOLENT OFFENDER TASK FORCE WITH REIMBURSEMENT OF UP TO $6,250.00 IN OVERTIME EXPENSES FOR THE PERIOD OF OCTOBER 1, 2019 TO SEPTEMBER 30, 2020 UNDER THE OBLIGATION DOCUMENT).

[5] Jesse Fox Mayshark, Compass Knox, and Tyler Whetstone, *County's 287(g) program tears families apart. And it might be illegal.* Knoxville News Sentinel Published 12:01 AM EDT Apr. 1, 2021 Updated 1:29 PM EDT Jun. 10, 2021 ("What we agreed to do, we do not believe that to be immigration enforcement because we do not go out into the community at all . . . Only if they're brought to a jail do our people get involved.").

183. By transferring suspected undocumented immigrants into ICE's custody, Defendants place the health of those detainees at an extreme risk. ICE detainees suffer from COVID-19 infection at rates a degree of magnitude greater than those of the general population. ICE has also engaged in the unnecessary and involuntary sterilization of its detainees.

184. The fact that the Defendants are implementing an unconstitutional policy and practice necessarily constitutes actionable harm.

185. Absent declaratory and injunctive relief, this custom, policy, or practice will continue.

(vii) **The Knox County legal community warned Defendants that their lack of a valid 287(g) agreement violated the Fourth Amendment rights of suspected undocumented immigrants.**

186. Under clearly established federal law, local law enforcement violates the Fourth Amendment when enforcing federal immigration law without a valid 287(g) agreement. *Arizona v. United States*, 567 U.S. 387, 408 (2012) (noting the "limited circumstances in which state officers may perform the functions of an immigration officer, such as "when the Attorney General has granted that authority to specific officers in a formal [287(g)] agreement with a state or local government.")

187. On April 28, 2021, a community legal group sent Defendants a signed letter explaining that Knox County's 287(g) agreement was invalid for having not been approved by the Knox County Commission and that illegally enforcing federal immigration law exposed the Defendants to immense civil liability.

188. Signatories to the letter included over a dozen Tennessee law professors, a former Tennessee Supreme Court justice, multiple former judicial clerks for the Tennessee Supreme Court, and numerous legal practitioners and law students. *See* Exhibit 11.

(viii) **The Department of Justice has yet to agree to represent Sheriff Spangler.**

189. The 287(g) agreements contain a provision for Sheriff Spangler to apply for representation from Department of Justice when, as here, he is sued in his individual capacity for "activities carried out under this [agreement.]" *See* Exhibit 5 (2017 287(g) agreement, p. 7, ¶ XII; 2020 287(g) agreement p. 4, ¶ H.)

190. The Department of Justice has yet to exercise its discretion to represent Sheriff Spangler.

**(ix)    Defendants violated Plaintiff's constitutional rights and ICE policy by attempting to illegally enforce immigration law and subjecting her to a subsequent unlawful detention without probable cause.**

191. Defendants have made it the official policy of Knox County to act in all ways as though Knox County possessed a valid 287(g) agreement and corresponding ICE IGSA, including by investigating, interrogating, and detaining suspected civil immigration violators.

192. Defendants do not have a valid 287(g) agreement or ICE IGSA. By masquerading as ICE agents without the statutory authority provided by a 287(g) agreement, Defendants have made it the official policy of Knox County to routinely violate the Fourth Amendment rights of suspected civil immigration violators.

193. Plaintiff was subjected to investigation, interrogation, and warrantless detention detained in accordance with this policy.

194. Defendant's warrantless detention of Plaintiff after 2:08 PM November 7, 2020, the time when she had been ordered to be released by a Knox County Magistrate, constituted a second, separate warrantless seizure under the Fourth Amendment.

28

195. Probable cause for a civil immigration detention can only be determined by an ICE officer or a local law enforcement officer acting under a valid 287(g) agreement.

196. By detaining Plaintiff, a victim of domestic violence, the Defendants violated ICE policy Number 10076.1 barring enforcement actions against the victims or witnesses of domestic assault absent special circumstances or aggravating factors.

197. Defendants also violated the certification requirements of 8 U.S.C. 1229(e)(2)(A) as part of their longstanding municipal policy, practice and custom of failing to comply with the investigation and certification requirements of that statute when they were impersonating immigration officers.

198. Defendants lacked probable cause to detain Plaintiff because the probable cause determination was not made by an ICE officer or local law enforcement officer acting under a valid 287(g) agreement.

199. Defendants also lacked probable cause to detain Plaintiff because the probable cause determination was impermissibly made based only on Plaintiff having been born in Honduras.

200. Because the Plaintiff's I-247A, I-286, and I-216 forms were signed by a KCSO officer lacking the authority to enforce federal immigration law, those forms did not provide the authority to detain Plaintiff or transfer Plaintiff to ICE custody.

201. Defendants lacked legal authority to detain Plaintiff by failing to provide at the time of her second detention any I-286 or ICE administrative warrant, falsely representing that she had decided not to exercise her right to have her custody determination reviewed by an immigration judge, and by falsely claiming that she had refused to sign the I-286.

202. By detaining Plaintiff without probable cause, 287(g) authority or a valid ICE IGSA, Defendants violated Plaintiff's Fourth Amendment rights.

203. By making it their policy, custom, or practice to systematically detain non-white persons born outside of the United States without probable cause, valid 287(g) authority or a valid ICE IGSA, Defendants engaged in a prolonged campaign of civil rights violations in exchange for ICE detention payments.

**(x)      Defendants fraudulently concealed evidence of their illegal enforcement of federal immigration law until a court ordered disclosure of their 287(g) records.**

204. In the recent Knox County Chancery Court case, *Meghan Conley v. Knox County Sheriff Tom Spangler*, Defendants were sued under Tennessee's public records law for their years-long pattern and practice of denying public access to records related to their 287(g) program. Knox County Chancery Court No. 197897-1. The Chancery Court's final order, entered on November 23, 2020, barred Defendants from continuing their practice of using specious reasons to bar public access to 287(g) records. The final order is a public record in the Defendants' possession.

205. Until entry of the Chancery Court's order, Defendants had refused to disclose public records documenting their illegal 287(g) program, including the ICE detention and transfer forms (I-216, I-247A, and I-286), unlawfully signed by KCSO deputies incorrectly claiming to be ICE officers, used to detain suspected undocumented immigrants.

206. Defendants routinely denied citizens access to these public records and also routinely failed to turn over these records to detainee's attorneys.

30

207. Without accessing these records, it was impossible to determine whether the Defendants were illegally enforcing federal immigration law or whether all immigration investigation and detention decisions were being made by the ICE personnel stationed inside of the Knox County Detention Center.

208. Only once the Chancery Court's order was in place could it be discovered that Defendants had adopted the policy and practice of illegally enforcing federal immigration law in exchange for payments from ICE.

209. Plaintiff's detention records, including her transfer and detention forms, were obtained through a Public Records Act made in October of 2021.

210. Upon information and belief, the Defendants continue to arrest, interrogate, and detain suspected undocumented immigrants in exchange for a daily detention fee from ICE.

211. The Defendants have publicly contended that they retain authority to arrest and detain suspected undocumented immigrants and intend to continue doing so into the future.

212. Accordingly, regardless of whether the Defendants currently detain suspected undocumented immigrants in exchange for a daily detention fee from ICE or the number of such detainees, the Defendants intend to continue this practice in the future.

**(xi)** **Defendants have a policy, practice, or custom of arresting non-white persons or persons of Hispanic ethnicity as a pretext for illegal immigration detention.**

213. On information and belief, Defendants arrested Plaintiff as a pretext for subjecting her to an unlawful detention for civil immigration violations and receiving payment from ICE.

214. Defendants then gave ICE physical custody of the Plaintiff, preventing her from being arraigned on her criminal charges on November 10, 2021.

31

215. By preventing resolution of Plaintiff's criminal charges, Defendants caused her to be subjected to a second lengthy detention by ICE in a privately-run Louisiana detention center.

216. On information and belief, it is Defendants' policy, practice, or custom to pretextually arrest non-white persons or persons of Hispanic ethnicity, or non-English speakers, just as Defendants arrested Plaintiff.

217. As part of this policy of pretextual arrests, Defendants regularly arrest foreign nationals who reside in Tennessee for driving on a suspended license, although an arrest is not required under the statute.

218. Like the Plaintiff, once those persons make bail or are ordered released, Defendants subject them to a subsequent illegal immigration detention, and then give physical custody to ICE, preventing arraignment or attendance at criminal proceedings in Knox County.

219. Defendants are able to profit by taking the bail money of these persons physically removed from Knox County by ICE and incapable of attending their own criminal proceedings.

> **(xii)** **Defendants continuous and sustained renegade immigration detentions deprive Knox County's noncitizen, Hispanic, and Spanish-speaking residents of their rights.**

220. As exemplified by Sheriff Jones's statement and their failure to make good-faith attempts to follow the law's clear guidelines despite ample warning and time for compliance, Defendants sustained and ongoing civil rights violations and flaunting of federal, state, and local law described above are animated by ill-will and malice towards "illegal immigrants"—noncitizen, Hispanic, and Spanish-speaking Knox County residents—based on their race, ancestry, or national origin.

221. Of the over one thousand immigration detainees held by Defendants between August 1, 2018, and May 31, 2020, only two had Anglo-Saxon names: Henry Lipman and Shelldon Welsh.

222. Defendant Knox County acted negligently in allowing Sheriff Spangler and his deputies to arrest and prosecute Plaintiff on the false allegation of domestic assault, a charge that was resolved in her favor.

223. In the alternative, both Defendants acted maliciously in prosecuting Plaintiff for the false allegation of assault, a charge that was resolved in her favor.

224. Defendant Knox County acted negligently in allowing Sheriff Spangler and his deputies to illegally detain Plaintiff based on alleged civil immigration violations.

225. In the alternative, both Defendants acted maliciously by illegally detaining Plaintiff based on alleged civil immigration violations.

226. Defendants' actions are part of an on-going and continuous series of constitutional, statutory, and common law violations committed as part of their policy of illegally enforcing immigration law under an invalid 287(g) agreement. The Defendants continue to enforce this policy despite knowledge that they are breaking the law.

227. Plaintiff is just one of the over a thousand foreign nationals, Hispanics, and Spanish-speaking persons intimidated and coerced by Defendants' years-long policy and practice of targeted civil rights violations.

**Class Allegations**

228. The Plaintiff brings this action on behalf of herself and all others who are similarly situated under Federal Rules of Civil Procedure 23(a)(2) and (b)(2).

229. A class action is proper because this action involves questions of law and fact common to the class, the class is so numerous that joinder of all members is impractical, Plaintiffs' claims are typical of the claims of the class, the Plaintiff will fairly and adequately protect the interests of the class, and Defendants have acted on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate with respect to the class as a whole under Rule 23(b)(2).

230. In addition to the Plaintiff, there are numerous other administrative detainees who have been held, who are being held, or who will be held by the Defendants purporting to act as immigration detention contractors for ICE. The same unlawful immigration detention services program implemented by the Defendants pursuant to the invalid 287(g) agreements underlies all of these detentions.

231. In addition, there are numerous other foreign nationals, Hispanics, and Spanish-speaking persons who have been unlawfully targeted for arrest by the Defendants.

232. The classes are defined as: (1) all persons Defendants have detained for civil immigration charges pursuant to Defendants' invalid 287(g) agreements; (2) all persons detained by Defendants on civil immigration charges pursuant to an ICE detainer or otherwise held past expiration of their initial criminal detention based solely on suspected civil immigration charges without probable cause of a crime's commission; (3) all persons detained by Defendants on civil immigration charges without the issuance or presentation of an ICE administrative warrant; (4) all foreign nationals, foreign-born Knox County residents, Hispanics, or Spanish-speaking persons pretextually arrested or detained by Defendants.

34

## II. **The Rule 23(a) Factors Are Satisfied Here**

233. **Rule 23(a)(1) - Numerosity**

a. The Proposed Class is so numerous that joinder of all members is impracticable. Many of the Prospective Class Members have already been removed from the United States.

b. Although the Plaintiff does not state with precision the number of individuals in the Proposed Class (the "Proposed Class Members"), that number is easily ascertainable by the Defendants, who have received and will continue to receive per diem payments for each day they house an administrative detainee.

c. Upon information and belief, there are at least 1300 Prospective Class Members. Upon information and belief, the Proposed Class is likely comprised of thousands of individuals. *See* Exhibit 7.

234. **Rule 23(a)(2) – Common Questions of Law or Fact**

a. As required by Rule 23(a)(2), common questions of law and fact bind the members of the Proposed Class.

b. These include, but are not limited to, the invalidity of the Knox County 287(g) agreements and related ICE IGSAs, whether the Defendants had lawful authority to detain suspected undocumented immigrants and whether those detentions constituted unconstitutional seizures under the Fourth Amendment, whether Defendants had probable cause to detain suspected undocumented immigrants after their criminal detention ended, whether the Defendants have acted ultra vires by implementing a 287(g) program without a lawful 287(g) agreement, and whether the Defendants targeted this class for false arrest, prosecution, or illegal detention based on their color, ethnicity, or country of origin.

235. **Rule 23(a)(3) – Typicality**

a. The claims of the named Plaintiff are typical of the claims of the Proposed Class as a whole because she was subject to discriminatory arrest and detained under Defendants' custom, policy, or practice of maintaining a working 287(g) program without a valid 287(g) agreement.

b. Defendants have unlawfully detained and will continue to unlawfully detain suspected undocumented immigrants absent declaratory, injunctive, compensatory, and punitive relief from this Court. Relief for the Plaintiff therefore will also constitute relief for the Proposed Class.

236. **Rule 23(a)(4) Adequacy**

a. The Plaintiff and her counsel will adequately protect the interests of the class.

b. The Plaintiff is unaware of any conflict between her interests and those of the Proposed Class.

c. The members of the Proposed Class are ascertainable and identifiable through notice and discovery. In defending her own rights, the individual Plaintiff will defend the rights of all class members fairly and adequately.

d. Furthermore, the Plaintiff is represented in this case by counsel with extensive knowledge of ICE detention practices and federal immigration law.

### III. The Rule 23(b)(2) Standard is Also Satisfied Here

237. The Defendants have acted on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. The Defendants have continued to operate a 287(g) program despite lacking a

valid 287(g) agreement. The Plaintiff anticipates that the Defendants will attempt to defend their purported 287(g) program on grounds common to the Proposed Class.

## CAUSES OF ACTION

### COUNT I
*Monell* **Claim: Violations of Plaintiff's and Prospective Class Members' Fourth and Fourteenth Amendment Rights, Actionable Under 42 U.S.C. § 1983.**

238. Plaintiff realleges, restates, and incorporates by reference the allegations made in the preceding paragraphs. Immigration detentions initiated without proper statutory authority are Fourth Amendment violations.

239. An authorized 287(g) agreement with ICE is the only means by which the Defendants can independently enforce federal civil immigration law by such actions as conducting immigration interrogations, detaining suspected immigration violators, or signing ICE custody forms and detainers.

240. As explained above, there is no lawfully executed agreement in place between ICE and Defendants. Under Tennessee statutory law and the Knox County Charter, Defendants have no independent power to enter the county into a 287(g) agreement or IGSA with the federal government absent proper authorization. Thus, Defendant's current arrangement with ICE is unlawful, *ultra vires*, and of no legal force.

241. Defendants have made it the official policy, custom, or practice of Knox County to enforce federal immigration law under invalid 287(g) agreements and corresponding IGSAs.

242. As part of this custom, policy, and/or practice, the Defendants have required and directed KCSO deputies to illegally act as immigration officers by investigating, interrogating, and detaining suspected undocumented immigrants.

37

243. By implementing and sustaining a 287 (g) program without seeking and receiving the Knox County Commission's approval, as required by both state and local law, the Defendants have knowingly made it their policy to routinely violate the Fourth Amendment by subjecting Plaintiff and prospective class members to illegal immigration detentions.

244. Since June of 2017, Defendants have interrogated, investigated, and detained thousands of people for suspected civil immigration violations yet do not have a valid 287(g) agreement or ICE IGSA.

## COUNT II
### *Monell* Claim: Violations of Plaintiff's and Prospective Class Members' Fourth Amendment Rights, Actionable Under 42 U.S.C. § 1983

245. Plaintiff realleges, restates, and incorporates by reference the allegations made in the preceding paragraphs.

246. Defendants have made it the official policy, practice, or custom of Knox County to subject foreign nationals, Hispanics, and Spanish-speaking persons to illegal, warrantless seizures.

247. As illustrated by Plaintiff's two illicit seizures, these targeted seizures based on race, national origin, or ethnicity, occur both outside and inside of the Knox County Detention Facility.

248. As illustrated by Defendant's practice of arresting foreign nationals, Hispanics, and Spanish-speaking persons for crimes they cannot commit, such as driving on a suspended license, or charging them under non-criminal statutes, such as an implied consent violation, Plaintiff's illicit seizure for domestic assault, a crime she did not commit, is but one instance of an established policy, custom, or practice.

38

## COUNT III
### *Monell* Claim: Violations of Plaintiff's and Prospective Class Members' Fourth and Fourteenth Amendment Rights, Actionable Under 42 U.S.C. § 1983

249. Plaintiff realleges, restates, and incorporates by reference the allegations made in the preceding paragraphs.

250. Defendants' policy and practice of enforcing federal immigration law without a valid 287(g) agreement has spawned a host of additional related civil rights violations inflicted on Plaintiff and Prospective class members by subjecting them to an illegal immigration detention: (1) based only on knowledge of their country of birth; (2) without an immigration officer's allegation of probable cause of an immigration violation; (3) by falsely endorsing ICE forms as though Defendants' deputies were immigration officers, and; (4) without an administrative warrant.

251. By turning custody of Plaintiff and prospective class members over to ICE, Defendants deprived them of their ability to attend their arraignment or other criminal proceedings, a violation of the Fourteenth Amendment.

## COUNT IV
### *Monell* Claim: Violations of Plaintiff's and Prospective Class Members' Fourth Amendment Rights, Actionable Under 42 U.S.C. § 1983.

252. Plaintiff realleges, restates, and incorporates by reference the allegations made in the preceding paragraphs.

253. In the alternative, even if Defendants had valid ICE detainers and administrative warrants, their policy of seizing suspected undocumented immigrants based on ICE I-247A detainers or administrative warrants violates the Fourth Amendment.

39

254. ICE I-247A detainers request that law enforcement detain a person for up to 48 hours after their criminal detention ends on the basis that probable cause exists to believe they are removable.

255. ICE administrative warrants are issued by non-judicial ICE officers.

256. Neither an I-247A nor an administrative warrant can justify a seizure because neither document meets the Fourth Amendment's requirements of having been issued by a neutral and detached magistrate upon a finding of probable cause.

257. Seizures and arrests lacking a valid warrant violate the Fourth Amendment protection against unreasonable search and seizure.

258. Plaintiff and prospective class members were subjected to illegal detention by Defendants because they were detained on the basis of an I-247A detainer or administrative warrant, not on suspicion of a crime or a criminal warrant.

**COUNT V**
***Monell* Claim: Violation of Plaintiff's Fourth Amendment Rights, Actionable Under 42. U.S.C. §1983.**

259. Plaintiff realleges, restates, and incorporates by reference the allegations made in the preceding paragraphs.

260. Plaintiff was subjected to improper criminal arrest based on the Defendants' negligent failure to properly train deputies in how to analyze the probable cause for domestic assault arrest factors in section Tenn. Code Ann. § 36-3-619 and the Defendant's failure to train deputies in communicating with non-English speaking persons.

**COUNT VI**
***Monell* Claim: Violations of 42 U.S.C. § 1981 Actionable Under 42. U.S.C. §1983**

40

261. Plaintiff realleges, restates, and incorporates by reference the allegations made in the preceding paragraphs.

262. Section 1981 requires that "[a]ll persons within the jurisdiction of the United States shall have . . . the full and equal benefit of all laws and proceedings . . . as is enjoyed by white citizens." 42 U.S.C. § 1981.

263. Plaintiff, a Spanish-speaking, foreign-born Latina, was arrested after calling the Defendants to protect her from an ongoing domestic assault from her armed domestic partner.

264. Despite showing deputies injuries inflicted by her domestic partner, she was arrested, detained on criminal charges and subjected to an illegal immigration interrogation.

265. Plaintiff's arrest and illegal civil immigration detention were a direct result of Defendant's policy and practice or targeting non-white and/or Spanish-speaking persons for pretextual arrest.

266. Defendant routinely targets non-white and/or Spanish-speaking persons for pretextual arrest, such as arrests for driving on a suspended license or issuing warrants for implied consent violations.

267. Defendants encourage these pretextual arrests as a means to illegally interrogate people of Latinx ethnicity about their immigration status and earn money by illegally detaining them on behalf of ICE.

268. A properly authorized and implemented 287(g) agreement carefully implemented by trained officers can ensure the even enforcement of immigration law without regard for race or ethnicity. The Defendants' policy and practice of indiscriminately arresting non-

white persons in exchange for detention fees makes a mockery of federal law enforcement and amounts to little more than racialized bounty hunting.

## COUNT VII
### State and Federal Rights Actionable under Tenn. Code Ann. § 4-21-311

269. Plaintiff re-alleges, restates, and incorporates by reference the allegations made in the preceding paragraphs as if set forth fully herein.

270. These violations of federal and Tennessee law and constitutional rights are also actionable under Tennessee Code Annotated section 4-21-311 of the Tennessee Human Rights Act.

271. Through its unrelenting and sustained civil rights violations, animated by ill will and malice based on race, ancestry, and national origin, the Defendants have subjected Plaintiff and prospective class members to malicious harassment under the Tennessee Human Rights Act, Tennessee Code Annotated section 4-21-701.

272. Plaintiff called the Defendants' deputies for protection from her abuser. The Defendants' deputies knew Plaintiff had been sexually assaulted by her gun-wielding, English-speaking American partner, knew that he had inflicted the bruises on her thighs, and threatened her with weapons. They arrested her.

273. Once arrested, Plaintiff was denied access to her attorney, detained in spite of a judge's order demanding her release, detained because of her national origin and race by Defendant's deputies posing as ICE agents, detained without a warrant, a hearing, a translator, or hope of when she might go home to see her children again.

274. Defendants deprived her of her right to be free from unlawful searches and seizures, her right to an attorney, and her right to due process.

42

275. By falsely accusing Plaintiff of domestic assault and thus subjecting her to a protective order preventing her from being near here partner, Defendants kept Plaintiff from returning to her home, effectively depriving her of her property.

276. Plaintiff's treatment was typical of persons illegally detained by Defendants Knox County and Sheriff Spangler for alleged civil immigration violations.

277. Defendants are liable to Plaintiff and prospective class members for "special and general damages, including, but not limited to, damages for emotional distress, reasonable attorney's fees and costs, and punitive damages."

## COUNT VIII
## False Imprisonment

278. Plaintiff re-alleges, restates, and incorporates by reference the allegations made in the preceding paragraphs as if set forth fully herein.

279. By subjecting Plaintiff to an unlawful immigration detention against her will and past the expiration of the Knox County magistrate's twelve hour hold at 2:08 on November 7, 2020, Defendants falsely imprisoned Plaintiff.

280. Because Defendants knew that they could not enforce federal immigration law without a valid 287(g) agreement, Defendants acted intentionally and knowingly by falsely imprisoning Plaintiff.

281. Because Defendants knew that, even if a valid 287(g) agreement existed, enforcing federal immigration law required them to follow ICE policy, Defendants acted intentionally and knowingly by falsely imprisoning Plaintiff.

282. Because Defendants detained Plaintiff without a warrant, Defendants acted intentionally and knowingly by falsely imprisoning Plaintiff.

43

283. Similarly, each time that the Defendants have taken physical custody of a suspected undocumented immigrant under invalid 287(g) agreements and invalid ICE IGSAs, Defendants have intentionally detained that suspected undocumented immigrant against his or her will and have done so without lawful authority under federal law, Tennessee law, and the Knox County Charter.

284. Tennessee Code Annotated section 40-7-103 does not allow an officer to make an arrest or seizure based only on a report of a civil immigration violation.

285. For these reasons, the Defendants have falsely imprisoned the Plaintiff and all similarly situated detainees that they have detained under invalid 287(g) agreements and invalid ICE IGSAs.

286. To the extent that the Defendants detain any administrative detainees under a purported immigration detention services agreement with the federal government going forward, those administrative detainees have also been falsely imprisoned by the Defendants.

**COUNT IX**
**Civil Conspiracy under § 1985**

287. Plaintiff re-alleges, restates, and incorporates by reference the allegations made the preceding paragraphs as if set forth fully herein.

288. Defendants have conspired to deprive foreign nationals, Hispanics, and Spanish-speaking persons of their equal protections under the law by subjecting them to illegal seizures.

**COUNT X**
**Intentional Infliction of Emotional Distress**

289. Plaintiff re-alleges, restates, and incorporates by reference the allegations made the preceding paragraphs as if set forth fully herein.

44

290. By arresting for domestic assault a domestic violence victim who called the police for protection from her abuser, the Defendants, through their deputies, intentionally engaged in acts that cannot be tolerated by civilized society.

291. These acts caused Plaintiff to suffer great mental distress; Defendants are thus liable for intentional infliction of emotional distress.

## COUNT XI
## Declaratory Judgment and Injunction Against Ultra Vires Actions by the Defendants

292. Plaintiff re-alleges, restates, and incorporates by reference the allegations made the preceding paragraphs as if set forth fully herein.

293. As explained, because the Knox County Commission never approved the 287(g) agreements or ICE IGSAs, under Tennessee law and the Knox County Charter, the Defendants do not have a valid 287(g) agreement and thus cannot enforce federal immigration law, detain suspected undocumented immigrants, or receive payments from ICE for those detentions.

294. The Defendants nevertheless continue to illegally detain suspected immigration violators, defying Tennessee law.

295. Under Tenn. Code Ann. § 1-3-121, "for any affected person who seeks declaratory or injunctive relief in any action brought regarding the legality or constitutionality of a governmental action. A cause of action shall not exist under this chapter to seek damages."

296. The Plaintiff still lives in this jurisdiction, continuing to pay Tennessee and local taxes.

297. The continued implementation of the immigration detention program will impact the Plaintiff's tax payments, as it affects the allocation of resources by the Defendants; the

45

Defendants require tax revenue from Knox County taxpayers to support their unlawful immigration detention program.

298. Regardless of the impact of the immigration detention program on the Plaintiff's taxes, the Plaintiff has a special interest in declaratory relief and an injunction, over and above the interests of other members of the Knox County community. The Plaintiff has already suffered a special injury from the ultra vires acts of the Defendants, who have seized and detained her unlawfully, and who have taken physical custody of her without adequate contractual protections as described above.

299. There is a reasonable possibility that the Plaintiff could be seized and detained by the Defendants again without lawful authority. The continuance of the immigration detention program by the Defendants therefore specially injures her for that reason as well.

300. Plaintiff requests the following declaratory relief:

   a. that the Knox County 287(g) agreements and ICE IGSAs were void from inception for failure to satisfy statutory requirements.

301. Plaintiff also requests the following injunctive relief:

   a. That Defendants be enjoined from detaining persons on I-247A detainers and ICE administrative warrants.

   b. That Defendants be enjoined from any further attempts to illegally enforce immigration law.

   c. That in the event that Defendants be allowed to continue enforcing federal civil immigration law in any capacity, they be enjoined from systematically and routinely violating ICE detention policy.

46

## PRAYER FOR RELIEF

WHEREFORE, respectfully request that the Court:

a.  That service of process be had upon Defendants and that Defendants be required to appear and answer this complaint within the time prescribed by law;

b.  Declare that the Defendants' actions have violated Tennessee law in multiple respects, including, but not limited to, making a declaration that the Defendants have no lawful authority to enforce federal immigration law in return for monetary payments from the federal government, that the Defendants have unjustly enriched themselves through those payments, and that those the Defendants' actions are *ultra vires*;

c.  Declare that the Defendants' actions are unconstitutional under the Fourth and Fourteenth Amendments to the United States Constitution;

d.  Grant the above-requested declaratory and injunctive relief;

e.  Award Plaintiff and Prospective Class Members nominal, compensatory, and punitive damages for the deprivation of their constitutional rights;

f.  Award Plaintiff litigation expenses, costs of suit, and reasonable attorney's fees as provided by law, including but not limited to, pursuant to 42 U.S.C. § 1988; and

g.  Grant to Plaintiff such other or further relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

_/s/Andrew Fels_____
Andrew Fels, Esq. BPR #036005
3214 Fountain Park Blvd.
Knoxville, TN 37917
865-567-4881
andrewchristianfels@gmail.com


___/s/Rachel Bonano_____
Rachel Bonano, Esq. BPR 030458
Law Office of Rachel Bonano, PLLC
865 Ebenezer Road
Knoxville, TN 37923
Tel. (865) 282-5309
Fax (865) 251-5383
rbonano@bonanolaw.com

**CERTIFICATE OF SERVICE**

       I hereby certify that a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular United States Mail, postage prepaid. Parties may access this filing through the Court's electronic filing system.

      /s/Rachel Bonano_____